**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| B.S., a minor, and JENNIFER SCHUH, individually and as the mother and next friend of B.S., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 23-cv-16446 |
| v. | ) ) | Judge Andrea R. Wood |
| BOARD OF EDUCATION OF DOWNERS GROVE GRADE SCHOOL DISTRICT 58, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Jennifer Schuh, the mother of B.S,[1] brings this action against Defendant Board of Education of Downers Grove School District 58 ("District") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*,[2] seeking judicial review of an administrative decision regarding B.S.'s individualized education program ("IEP"). Specifically, Plaintiff claims that the District has violated the IDEA by denying B.S., a child with disabilities, a free appropriate public education ("FAPE"). The hearing officer found in favor of the District. Plaintiff now appeals that decision. Before the Court are the parties' cross-motions for summary judgment (Dkt. Nos. 46, 48, 71). For the reasons stated below, the Court grants the District's motion on the grounds that this action is moot. Accordingly, the case is dismissed.

---

[1] The caption of the amended complaint identifies both B.S. and Jennifer Schuh as plaintiffs. For the purposes of this opinion, the Court refers to the parent, Schuh, as Plaintiff, and her child as B.S.

[2] As the state educational agency authorized and required to establish a procedure for resolving IDEA disputes, the Illinois State Board of Education ("ISBE") was named in this action for the sole purpose of filing the administrative record in this case. (Am. Compl. ¶ 9, Dkt. No. 30; *see also* Def.'s Resp. to Pls.' Statement of Material Facts ("DRPSMF") ¶¶ 6–7, Dkt. No. 56.)

# BACKGROUND

## I.      Statutory Framework

Plaintiff, the mother of B.S., brings this action against the District, the school district in which B.S. enrolled as a student with disabilities in 2023. A "local education agency," as defined in 20 U.S.C § 1401(19), the District is obligated to comply with the IDEA. That statute was enacted "to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "In order to implement this goal, the [IDEA] provides for the evaluation of disabled children and the development of an individualized education program ('IEP') for each disabled child." *Ostby v. Manhattan Sch. Dist. No. 114*, 851 F.3d 677, 680 (7th Cir. 2017). The IEP is a written statement "developed, reviewed and periodically revised in accordance with the [IDEA]." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)(i)). Serving multiple functions, an IEP "documents the child's present levels of academic achievement and functional performance; provides a list of measurable annual goals; describes how the child's progress towards the goals will be measured; and presents a statement of the special education and related services to be provided to the child, among other things." *Id.* (citing 20 U.S.C. § 1414(d)(1)(A)).

The IDEA "requires that states, as a condition of receiving federal funds, provide each disabled child within their school system a [FAPE]." *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 590 (7th Cir. 2006). With respect to children who transfer schools within the same state, the IDEA provides, in relevant part:

> In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a [FAPE], including services comparable to those described in the previously held

2

> IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law.

20 U.S.C. § 1414(d)(2)(C)(i)(I).

Pursuant to relevant Illinois regulations, which address requirements for a FAPE for transfer students:

> In the case of an eligible student transferring into a district from another district within Illinois, when the new district obtains a copy of the student's IEP before or at the time the child is presented for enrollment:
>
> A) The district may adopt the IEP of the former local school district without an IEP meeting if: i) the parents indicate, either orally or in writing, satisfaction with the current IEP; and ii) the new district determines that the current IEP is appropriate and can be implemented as written.
>
> B) If the district does not adopt the former IEP and seeks to develop a new IEP for the child, within ten days after the date of the child's enrollment the district must provide written notice to the parent, including the proposed date of the IEP meeting, in conformance with [Ill. Admin. Code tit. 23, § 226.530]. While the new IEP is under development, the district shall implement services comparable to those described in the IEP from the former district.

Ill. Admin. Code tit. 23, § 226.50(a)(1).

Moreover, 34 C.F.R. § 300.323(f), which concerns IEPs for children who transfer public agencies in the same state, provides:

> If a child with a disability (who had an IEP that was in effect in a previous public agency in the same State) transfers to a new public agency in the same State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide [a] FAPE to the child (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency either—
>
> (1) Adopts the child's IEP from the previous public agency; or
>
> (2) Develops, adopts, and implements a new IEP that meets the applicable requirements in §§ 300.320 through 300.324.

3

Finally, a parent who believes that her child was denied a FAPE in violation of the IDEA "may pursue relief in state administrative proceedings." *Alex R. v. Forrestville Valley Comm. Unit Sch. Dist. #221*, 375 F.3d 603, 611 (7th Cir. 2004) (citing 20 U.S.C. § 1415(f)). The IDEA establishes formal procedures for resolving disputes between parents and schools regarding the provision of a FAPE. As explained by the Supreme Court in *Fry v. Napoleon Community Schools*, 580 U.S. 154, 159 (2017):

> To begin, a dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides). *See* § 1415(b)(6). That pleading generally triggers a "[p]reliminary meeting" involving the contending parties, § 1415(f)(1)(B)(i); at their option, the parties may instead (or also) pursue a full-fledged mediation process, *see* § 1415(e). Assuming their impasse continues, the matter proceeds to a "due process hearing" before an impartial hearing officer. § 1415(f)(1)(A); *see* § 1415(f)(3)(A)(i). Any decision of the officer granting substantive relief must be "based on a determination of whether the child received a [FAPE]." § 1415(f)(3)(E)(i). If the hearing is initially conducted at the local level, the ruling is appealable to the state agency. *See* § 1415(g). Finally, a parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court. *See* § 1415(i)(2)(A).

## II.      Factual Background

The Court bases its recitation of the facts below on the administrative record, the Hearing Officer's findings of facts, and the parties' statements of material facts.[3] For ease of reference, the Court primarily cites the parties' statements of material facts.

---

[3] The District raises multiple objections to Plaintiff's statement of material facts, asking the Court to strike or disregard in their entirety certain paragraphs for violating Local Rule 56.1. Primarily, the District contends that Plaintiff fails to cite the administrative record or makes conclusory statements. (*See, e.g.*, DRPSMF ¶¶ 14, 20, 37–39, 56–57, 60–61.) "[T]he decision whether to apply [Local Rule 56.1] strictly or to overlook any transgression is one left to the district court's discretion." *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011). Although certain paragraphs in Plaintiff's statement do not cite the administrative record, the Court did not struggle to find the relevant portions of the record. Notably, only a handful of Plaintiff's total 61 factual paragraphs failed to cite to the record. (DRPSMF ¶¶ 14, 20, 52.) Those omissions were *de minimis*, so the Court exercises its discretion to excuse them. The Court relies only on those statements with a factual basis in the record.

B.S., the son of Plaintiff, is now nine years old. (Def.'s Resp. to Pls.' Statement of Material Facts ("DRPSMF") ¶ 3, Dkt. No. 56.) B.S. is a child with disabilities who has been diagnosed with autism and attention deficit hyperactivity disorder ("ADHD"). (DRPSMF ¶ 3.)

During the 2020–21 school year, B.S. attended pre-kindergarten at the Brokaw Early Learning Center located within Community Unit School District No. 308 ("Oswego District"). (Pls.' Resp. to Def.'s Statement of Material Facts ("PRDSMF") ¶ 5, Dkt. No. 53.) On May 13, 2021, the Oswego District conducted a comprehensive reevaluation for B.S., and its IEP team determined that he met the eligibility criteria for special education and related services in connection with his medical diagnoses of autism and ADHD. (*Id.* ¶ 5.) The Oswego District's IEP team reconvened on May 26, 2021, and developed an IEP for B.S. ("May 2021 IEP"), which, among other things, recommended his placement in a blended early childhood classroom with supplementary aides. (*Id.* ¶ 6; DRPSMF ¶¶ 8, 12.) Plaintiff, however, requested that B.S. be placed in a general education classroom with one-to-one paraprofessional support. (PRSDMF ¶ 7.) Thereafter, on June 14, 2021, the Oswego District revised B.S.'s IEP ("June 2021 IEP"), recommending that 81% of B.S.'s weekly school time take place inside a general education classroom with one-to-one paraprofessional support. (*Id.* ¶ 8; DRPSMF ¶¶ 21, 24.) Among other provisions, the June 2021 IEP required that B.S. receive 755 minutes of school time per week. (DRPSMF ¶ 23.) Later, Plaintiff cancelled an IEP meeting scheduled for September 10, 2021, and withdrew B.S. from the Oswego District to homeschool him. (PRSDMF ¶ 11.) B.S. was homeschooled by Plaintiff for the next sixteen months, until January 2023. (*Id.*)

In January 2023, Plaintiff enrolled B.S., then seven years old, in Kingsley Elementary School in the District and provided the District with the June 2021 IEP from the Oswego District. (*Id.* ¶ 12; DRPSMF ¶¶ 31–32.) In early January 2023, Plaintiff met with the District's

team to discuss B.S.'s transition to attending school there. (PRSDMF ¶ 13.) At the meeting, the District recommended placing B.S. in the BEST program, a specialized program outside the general education setting. (*Id.*) To facilitate his transition to a school setting after being homeschooled for an extended period, Plaintiff and the District agreed that B.S. initially would participate in the BEST program for one hour per day. (*Id.* ¶¶ 13–14, 17.) The District advised Plaintiff that it would implement the June 2021 IEP upon B.S.'s enrollment with the BEST program, and Plaintiff agreed. (*Id.* ¶ 15.) Prior to starting the BEST program, Plaintiff and B.S. met with the BEST program team. (*Id.* ¶ 16.) During that meeting, B.S. demonstrated highly dysregulated behavior, including running around the room, grabbing scissors, and throwing play dough at a school administrator. (*Id.*) The BEST program team and Plaintiff discussed the potential need to consider a therapeutic day school ("TDS") for B.S. (*Id.*)

On January 23, 2023, B.S. began in the District's BEST program for one hour per day to support his transition to a school setting. (*Id.* ¶ 17.) Plaintiff did not request any time in the general education classroom. (*Id.*) Throughout his time in the BEST program, B.S. demonstrated highly dysregulated, disruptive, and unsafe behavior. (*Id.* ¶ 18–19.) He was physically aggressive towards other students and staff—attempting to hit, kick, and punch the teacher—and exhibited verbal aggression, including making verbal threats to put people in the incinerator or in the woodchipper, that he was going to bring mechanical devices and hurt people, and that he was going to kill people. (*Id.* ¶ 19.) When B.S. showed physical and verbal dysregulation, the other students would hide under their desks and cry. (*Id.* ¶ 19.) The BEST program included two full-time paraprofessionals assigned to the classroom, but they were afraid to work with B.S. (*Id.* ¶ 18.) Instead, the BEST classroom teacher, who developed a positive relationship with B.S.,

served as one-to-one certified staff support to B.S. during his time in the BEST classroom due to his functioning levels and dysregulated behavior. (*Id.*)

When the BEST classroom teacher was not working with B.S. as his one-to-one support, other members of the District's BEST program worked directly with B.S. to provide such support, including the BEST program occupational therapist, social worker, and school psychologist. (*Id.*) B.S. also received one-to-one occupational therapy services, pursuant to the occupational therapy service minutes and the three occupational therapy goals from the June 2021 IEP. (*Id.* ¶ 22.) Although the therapist was unable to implement the three goals fully due to B.S.'s level of dysregulation, she provided all service minutes as required in the June 2021 IEP, as well as additional service minutes because B.S. required additional support. (*Id.*) Throughout the spring of 2023, the District communicated daily with Plaintiff about B.S.'s behavior and progress at school. (*Id.* ¶ 23.) B.S. was unable to access academic instruction fully at first due to his continued dysregulated behavior, which prevented him from attending the BEST Program for more than one hour a day. (*Id.* ¶ 26.)

In early February 2023, during parent-teacher conferences, the BEST classroom teacher shared with Plaintiff concerns about B.S.'s behavior and suggested that a TDS may be more appropriate for him. (*Id.* ¶ 24.) On February 9, 2023, Plaintiff sought an evaluation of B.S. from the District, but the District recommended delaying the evaluation until B.S. became more adjusted to the school setting after being homeschooled for an extended period. (*Id.* ¶ 25.) Plaintiff agreed and explained that there was an outside evaluation being conducted at the time. (*Id.*) Plaintiff obtained an independent educational evaluation ("IEE") for B.S., which was administered by a pediatric neuropsychologist and licensed clinical psychologist. (*Id.* ¶ 29.) Prior to the March 9, 2023, IEP meeting, Plaintiff provided the independent evaluation, dated February

13, 2023, to the District. (*Id.*) The evaluation found that B.S. demonstrated aggression, inattention, and impulsive behaviors, which were noted as consistent with the District's own observations, and that B.S. struggled with overall executive function skills related to behavioral and emotional regulation. (*Id.*)

On March 9, 2023, the District created a new IEP for B.S. ("March 2023 IEP"). (*Id.* ¶ 30.) At the March 9, 2023, IEP meeting, the District's IEP team discussed that it did not have concerns with supporting B.S. behaviorally during his 1.5 hours of attendance in the BEST program, but he would require additional support if his day extended beyond that duration. (*Id.* ¶ 31.) The IEP team further discussed B.S. receiving support from a one-to-one paraprofessional, but the District's hiring shortage at the time required the use of substitute paraprofessionals. (*Id.* ¶ 32.) Considering B.S.'s behavior and needs, the IEP team determined that such inconsistency would be harmful to B.S. and that adding a one-to-one paraprofessional to B.S.'s programming would not help him access his programming in the BEST Program, given that he was already receiving support from a one-to-one certified teacher and was not successful. (*Id.*) Based on B.S.'s required level of support, the IEP team recommended changing his educational placement to a TDS. (*Id.* ¶ 34; DRPSMF ¶ 51.) The District and Plaintiff agreed to B.S.'s placement in a TDS. (PRDSMF ¶ 34.) The IEP team determined that a TDS would better support B.S. because a TDS has dedicated staff to help students regulate social and emotional behaviors to access their educational programming, including academics, for a full day. (*Id.* ¶ 35.) Furthermore, the IEP team decided that there was no need to conduct a formal evaluation or Functional Behavioral Assessment ("FBA") of B.S. prior to changing his placement to a TDS because the baseline behavioral data from the Oswego District's FBA reflected B.S.'s targeted behaviors in the BEST program. (*Id.* ¶ 36.) In other words, there had not been a change in B.S.'s targeted behaviors.

Following the March 9, 2023, IEP meeting, Plaintiff confirmed her commitment to a TDS the next day via email, expressing an interest in securing a TDS placement for B.S. after spring break. (*Id.* ¶ 46.) On March 13, 2023, Plaintiff forwarded the executed signed releases for the District to start applying to TDS placements for B.S. (*Id.* ¶ 46.) From March 2023 throughout the fall semester, the District conducted an extensive search for a TDS that would be suitable for B.S. and agreeable to Plaintiff. (*Id.* ¶ 47.) The District reached out to multiple ISBE-certified TDSs and regularly forwarded lists of potential schools to Plaintiff throughout this time. (*Id.*)

In May 2023, the District proposed placement at Guiding Light, an ISBE-approved private TDS that was willing to enroll B.S. in June 2023. (*Id.* ¶ 48.) Plaintiff refused the placement and declined enrollment. (*Id.* ¶ 48.) On June 6, 2023, the District's IEP team and Plaintiff met to explore B.S.'s placement at a TDS further. (*Id.* ¶ 49.) Plaintiff continued to refuse B.S.'s placement at Guiding Light, explaining that the population there was not a suitable fit for B.S. (*Id.*) In the June 6, 2023, IEP, the District and B.S.'s IEP continued to recommend placement at a TDS. (*Id.*)

From January 23, 2023, through June 6, 2023, the end of the 2022–23 school year, B.S. attended Kingsley Elementary School via the District's BEST program. (DRPSMF ¶ 33.) Thereafter, B.S. stopped attending school in the District as the parties pursued his enrollment at a TDS. (*Id.* ¶ 52.)

Although Plaintiff and B.S. toured Britten School, a special education school, on June 29, 2023, the tour was cut short due to B.S.'s behavior, including biting and punching Plaintiff, running and jumping on furniture, making verbal threats, and demonstrating general dysregulation. (PRDSMF ¶ 50.) Little Friends, a TDS, likewise rejected B.S.'s enrollment on August 8, 2023, due to the severity of his aggression and dysregulation. (*Id.*) Plaintiff refused to

consider multiple TDSs throughout the summer and fall of 2023, and Plaintiff ultimately withdrew her consent on all release forms to share B.S.'s records on August 14, 2023. (*Id.* ¶ 51.)

On July 10, 2023, Plaintiff filed her first due process request with the ISBE. (*Id.* ¶ 62.) Subsequently, on September 11, 2023, Plaintiff filed her second due process request with the ISBE, which is the operative due process request underlying this action. (*Id.*) The District later filed its response to Plaintiff's second due process request on September 21, 2023. (*Id.* ¶ 63.)

On September 12, 2023, Plaintiff and the District's IEP team met to review the District's efforts to secure B.S.'s placement in a TDS, to discuss conducting a comprehensive reevaluation of B.S.'s functioning across multiple domains, and to create a plan for interim services in the home until B.S. was accepted into a full-time TDS. (*Id.* ¶ 54.) At the meeting, Plaintiff declined the District's request to send referral packets to four additional TDSs that reported immediate openings. (*Id.* ¶ 55.)

That same day, Plaintiff forwarded an executed release for Connect Academy, a TDS, after the District had first informed Plaintiff of a potential placement there in August 2023. (*Id.* ¶¶ 52, 56.) After touring the TDS, B.S. was accepted into the Connect Academy on September 24, 2023. (*Id.* ¶ 56.)

On October 20, 2023, Plaintiff and the District participated in an ISBE-sponsored mediation session to discuss resolving Plaintiff's due process complaint. (*Id.* ¶ 57.) Plaintiff agreed to sign releases to allow the District to pursue available ISBE-approved TDS placements for B.S. (*Id.*) The parties also agreed to conduct an IEE at public expense. (*Id.* ¶ 61; Hearing Officer's Opinion at 16, Dkt. No. 30-1.)

On October 31, 2023, B.S. attended Connect Academy for his first day. However, his dysregulated behavior, including physical aggression and verbal threats, led Connect Academy

to terminate his enrollment that same day. (PRSDMF ¶ 58.) On November 7, 2023, Laureate Day School informed the District of its willingness to schedule a tour with B.S. for potential placement, but later notified the District on December 19, 2023, that it would not accept B.S. due to lack of cooperation by B.S.'s father. (*Id.* ¶ 60.)

On December 20, 2023, the District had a fully executed contract with an independent evaluator to complete the IEE agreed to on October 20, 2023. (*Id.* ¶ 61.) By that point, the District had identified and communicated to Plaintiff at least twenty potential TDS placements. (*Id.* ¶¶ 46–60.)

The due process hearing before the Hearing Officer took place over five days from January 29, 2024, to February 2, 2024. (*Id.* ¶ 75.) The Hearing Officer heard testimony from sixteen fact witnesses and reviewed hundreds of exhibits to make findings on nine certified issues. (*Id.*) To varying degrees of specificity, those issues related to the District's compliance with the IDEA's requirements, the District's adoption of the June 2021 IEP, and the legality of B.S.'s change in placement to a TDS. (Hearing Officer's Opinion at 4–5.) On February 16, 2024, the Hearing Officer issued his opinion, finding in favor of the District on all nine certified issued based on a preponderance of the evidence and denying Plaintiff's requests for relief. (*Id.* at 18–27; PRSDMF ¶ 76.)

### III.    Issues for Judicial Review

Plaintiff initiated the present action in this Court in December 2023 and filed the amended complaint on February 29, 2024, alleging that the District denied B.S. a FAPE in violation of the IDEA.[4] Specifically, Plaintiff asks the Court to issue a declaratory judgment

---

[4] Plaintiff initiated this case on December 1, 2023, prior to exhausting her state administrative remedies. (*See* Dkt. No. 1.) Accordingly, in an order dated December 22, 2023, the Court denied Plaintiff's combined motion for a temporary restraining order, preliminary injunction, and expedited discovery because she could not show a likelihood of success on the merits. (Dkt. No. 22.) After completing the

11

finding that: (1) the District never adopted or created an IEP for B.S., and B.S. does not have an IEP from the District; (2) the District's March 9, 2023, placement change was illegal; (3) the District's placement change illegally excluded B.S. from school since June 6, 2023; (4) the District has illegally denied B.S. a FAPE since June of 2023; (5) the District did not implement the June 2021 IEP; and (6) the District failed to implement the 2021 IEP and denied B.S. his FAPE during his attendance at Kingsley Elementary School. (Am. Compl. at 22.) These six requests for declaratory relief center on two disputes at the center of this litigation: whether the District failed to adopt and implement the June 2021 IEP and whether B.S.'s change in placement to a TDS was illegal.

Beyond her request for a declaratory judgment, Plaintiff seeks other forms of relief: (1) that the Court overturn the Hearing Officer's decision; (2) that the Court order the District to annually place B.S. in a public or private school in DuPage County through the eighth grade, said school to be selected prior to the start of each school year by Plaintiff, said annual placement to be effectuated by and paid for in full by the District; and (3) an award of reasonable attorney's fees, filing fees, service fees, and expenses (*Id.* at 22.) For its part, the District asks the Court to affirm the decision of the Hearing Officer, which concluded that the District provided B.S. with a FAPE under the IDEA.

## DISCUSSION

The parties have filed cross-motions for summary judgment. Their initial motions focused on the merits of the Hearing Officer's decision. After those motions were fully briefed, however, the District sought leave to file a supplemental motion for summary judgment on the

---

administrative process and receiving an adverse decision from the Hearing Officer, Plaintiff filed the operative amended complaint on February 29, 2024. (Dkt. No. 30.)

jurisdictional issue of mootness. The Court granted leave for the District to do so because mootness is a threshold issue of subject-matter jurisdiction. *See Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) ("Mootness is a threshold jurisdictional question that insures that the court is faithful to the case or controversy limitation in Article III of the Constitution."). Accordingly, the Court starts its consideration there, prior to reviewing the merits of the Hearing Officer's decision.

## I.    Mootness

Article III of the Constitution limits the jurisdiction of federal courts to "actual, ongoing cases or controversies." *Ostby*, 851 F.3d at 682. "This requirement applies through all stages of federal judicial proceedings; to sustain jurisdiction, it is not enough that the dispute was alive when the case was filed or when an appeal was taken." *Id.* To have jurisdiction in a federal court, "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* "A case becomes moot when a court's decision can no longer affect the rights of litigants in the case before them and simply would be an opinion advising what the law would be upon a hypothetical state of facts." *Brown*, 442 F.3d at 596 (citations omitted).

### A.    Changed Circumstances

Since the Hearing Officer rendered his decision in February 2024, and the parties filed their cross-motions in May 2024, Plaintiff enrolled B.S. in a public school in Wisconsin in August 2024. For the 2024–25 school year, B.S. has remained at this out-of-state school, where he has been placed in a general education classroom with an aide. Plaintiff's counsel represented that B.S.'s current arrangement in the Wisconsin school is the arrangement that Plaintiff sought to obtain here in Illinois when B.S. was enrolled in the District.

In light of the changed circumstances, Plaintiff cannot demonstrate that an actual, ongoing controversy exists because "there is no longer an injury that can be redressed by a favorable decision." *Ostby*, 851 F.3d at 682. The primary dispute between the parties in this litigation concerns B.S.'s educational needs at the time that he was enrolled in the District in the spring of 2023. Although B.S. was eight years old when Plaintiff filed this action in February 2024, he was only seven years old at the time of the events underlying this lawsuit. Now, nearly two years after he was last enrolled in the District in June 2023, B.S. is nine years old and has pursued another school year at a new school in a different state with a new IEP. Plaintiff and B.S.'s relocation to a different school district and acceptance of a new IEP in that school district render moot any dispute over B.S.'s IEP in the District in 2023. *See Brown*, 442 F.3d at 590 (finding that a "change in circumstances render[ed] [the student's] case moot," where the parents enrolled their child in a different school district and agreed to a new IEP for his upcoming school year); *Ostby*, 851 F.3d at 682 (explaining that the case was moot where the student was no longer in the first grade and no longer subject to the challenged IEP); *see also Bd. of Educ. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L.*, 89 F.3d 464, 467 (7th Cir. 1996) (determining that the dispute, which concerned the student's fifth-grade IEP, was moot, where the student was about to enter eighth grade at a different school and an IEP had already been agreed upon at the new school). Even if the Hearing Officer erred in its ruling, such a finding "offer[s] [B.S] no relief at this stage." *Ostby*, 851 F.3d at 682.

### B.     The Requested Relief

Where, as here, Plaintiff seeks declaratory and other forms of relief, the requested relief does not revive the case. Under the IDEA, a district judge has the discretion "to order school authorities to reimburse parents for their expenditures on private special education for a child if

the court ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]." *Brown*, 442 F.3d at 596. Where a plaintiff brings a claim for reimbursement, other circuits have held that such a claim "can defeat a mootness challenge in an IEP placement dispute." *Id.* at 597. Relatedly, if a plaintiff seeks monetary damages, that plaintiff's case "is not moot even if the underlying misconduct that caused the injury has ceased." *Id.* at 595. Here, however, Plaintiff has failed to articulate a claim for damages in this Court. Notably, the amended complaint does not seek reimbursement for any expenditures related to private special education. To the extent Plaintiff seeks any form of monetary payment, she asks for attorney's fees and payment by the District in connection with B.S.'s ***future*** educational expenses in another school district through the eighth grade.

Only two paragraphs in the amended complaint, which spans over 140 paragraphs, allege that the District has failed to provide appropriate compensatory or interim educational services to B.S. since June 6, 2023. (Am. Compl. ¶¶ 37, 119.) And even then, Plaintiff concedes that the District paid one reimbursement for an in-home reading tutor. (*Id.* ¶¶ 37 n. 2, 119 n. 13; *see also* PRDSMF ¶ 59.) These two paragraphs alone are insufficient from which to infer that Plaintiff presently seeks reimbursement for any services. *Cf. Brown*, 442 F.3d at 597 (observing that the record of the plaintiffs' proceedings before the hearing officer "contain[ed] vague indications that, at some point, [they] sought reimbursement for the salary they paid to [a doctor]," but finding that the plaintiffs "apparently abandoned this claim for reimbursement" at the district level, where neither their complaint nor the "lengthy" trial briefing asked for reimbursement for the doctor's services).

Nor is it evident that Plaintiff sought reimbursement during the due process hearing. Before the Hearing Officer, Plaintiff requested, among other forms of relief, a comprehensive

reevaluation of B.S. (Hearing Officer's Opinion at 5.) In the event such a reevaluation supported

B.S.'s eventual placement in a TDS, Plaintiff then requested compensatory services—that is,

"reimbursement for out-of-pocket educational expenses"—until an appropriate placement could

be secured and agreed to by B.S.'s parents. (*Id.* at 5.) *Brown*, 442 F.3d at 597. To the extent

Plaintiff requested reimbursement at the due process hearing, such a request was prospective,

contingent on the whether the Hearing Officer ordered a reevaluation and whether that

reevaluation then supported B.S.'s eventual placement in a TDS. In short, the record reveals that

Plaintiff has not sought compensatory relief at any point.

As for Plaintiff's request for attorney's fees, such relief depends on whether Plaintiff is a

prevailing party within the meaning of the IDEA. Pursuant to the IDEA, "the court, in its

discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is

the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). *See also Steven L.*, 89 F.3d at

468 ("'Prevailing party' has the same meaning under 20 U.S.C. § 1415(e) as 42 U.S.C. § 1988,

under which a prevailing party may be granted attorneys' fees for successful prosecution of

certain civil rights actions. Courts interpreting these statutes apply the same principles to

determine a party's entitlement to attorneys' fees and costs."). But as this case is moot, there is

no basis upon which to consider an award of attorney's fees to a "prevailing party." *See Steven

L.*, 89 F.3d at 468; *Ostby*, 851 F.3d at 684 ("Nor is the possible availability of attorneys' fees

enough to keep the case alive under these circumstances.").

### C.    Plaintiff's Arguments

In opposition to the District's supplemental motion regarding mootness, Plaintiff raises

three arguments: (1) a request for declaratory judgment cannot be moot; (2) B.S.'s transfer to a

new, out-of-state school was necessary; and (3) the District's cited case law is inapposite. The Court finds each argument unpersuasive.

First, Plaintiff is mistaken that a request for declaratory judgment cannot be rendered moot. Like other requests for relief, requests for declaratory relief require an ongoing case or controversy. *Geisha, LLC v. Tuccillo*, 525 F. Supp. 2d 1002, 1009 (N.D. Ill. 2007) ("[T]he sole requirement for jurisdiction under the [Declaratory Judgment Act] is that the conflict be real and immediate, i.e., that there be a true, actual controversy required by the Act." (internal quotations marks omitted)). To determine whether a claim for declaratory relief presents a case or controversy under Article III, a court must consider " whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Simic v. City of Chicago*, 851 F.3d 734, 740 (7th Cir. 2017). "The party seeking a declaratory judgment in federal district court bears the burden of establishing the existence of an actual controversy." *Geisha*, 525 F. Supp. 2d at 1010. The Seventh Circuit and courts in this District regularly find requests for declaratory relief moot where there is no longer an ongoing controversy. *See, e.g.*, *Brown*, 442 F.3d at 596–600 (dismissing an IDEA case where the plaintiff parents sought injunctive and declaratory relief); *Swanigan v. City of Chicago*, 881 F.3d 577, 583 n.2 (7th Cir. 2018) (explaining that claims for declaratory relief require ongoing or impending harm); *Geisha*, 525 F. Supp. 2d at 1018 (denying the plaintiff's motion for summary judgment because "no 'actual controversy' exist[ed] in th[e] case to support the exercise of jurisdiction under the Declaratory Judgment Act"). As such, that Plaintiff seeks declaratory relief here does not, by itself, establish subject-matter jurisdiction.

Next, Plaintiff argues that B.S.'s enrollment in a new, out-of-state school was necessary and unavoidable. According to Plaintiff, had B.S. not enrolled in a new school outside of Illinois, B.S. would have either missed another year of school, or B.S. would have needed to submit to an "illegal" IEP crafted for him. But the legality of the IEP that the District developed for B.S., is immaterial to the question of whether there is an ongoing case or controversy. (In any case, Plaintiff's contention that the IEP placing B.S. in a TDS was illegal fails on its merits, as discussed below.)

Third, Plaintiff contends that the case law on which the District relies is legally and factually distinguishable and thereby does not support a finding of mootness. The Court disagrees. Contrary to Plaintiff's assertions, the plaintiffs in *Brown* sought declaratory ***and*** injunctive relief, not injunctive relief alone. *See Brown*, 442 F.3d at 597. The circumstances that supported a finding of mootness in *Brown* are comparable to the circumstances in this case. As for *Steven L.*, Plaintiff correctly observes that more time had passed there between the IEP dispute and the Seventh's Circuit mootness determination. *See Steven L.*, 89 F.3d at 466–67 (observing that the IEP dispute concerned the student's fifth grade educational needs, but the parents had agreed to a new IEP that would take affect when the student entered high school). While the greater passage of time weighed in favor of the mootness determination in *Steven L.*, the passage of time here, and the underlying events that transpired during that time, likewise support this Court's ruling.

### D. Exception to the Mootness Doctrine

Although Plaintiff does not raise the argument, the Court notes and considers the possibility that the exception to the mootness doctrine for wrongs "capable of repetition, yet evading review" might apply. *Brown*, 442 F.3d at 598–99; *Steven L.*, 89 F.3d at 467–68; *Ostsby*,

851 F.3d at 682–83. "That exception applies only in limited circumstances: 'where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Ostby*, 851 F.3d at 683 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990)). "Because IEP challenges usually endure longer than the nine-month school year, most circuits hold that the first, durational element of the mootness exception is satisfied in these cases." *Brown*, 442 F.3d at 599. Given the length of the school year, the Court acknowledges that the first prong is met here. *See, e.g.*, *Ostby*, 851 F.3d at 683 (citing *Brown* for the same proposition and explaining that the first part of the exception was met where the school district "concede[d] that the IEP recommendation that [the student] be placed in [a particular] program was, by its nature, too short in duration to be fully litigated prior to its cessation or expiration").

The analysis, then, turns on whether the second prong is met—that is, whether there is a reasonable expectation that B.S. will be subject to the same action again. "This 'reasonable expectation' of repetition must be more than 'a mere physical or theoretical possibility." *Brown*, 442 F.3d at 599 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). Here, there is no reasonable expectation that the same controversy will recur between Plaintiff, B.S., and the District. B.S. is no longer seven or even eight years old, and he is no longer subject to the challenged IEP. He has continued his education at a new school with a new IEP for the 2024–25 school year, and his educational needs moving forward will differ from his educational needs back in the spring of 2023, when he last attended school in the District. *See Brown*, 442 F.3d at 599 ("What was right for [the student] in kindergarten may not be the proper educational program when he enters the third grade. The dispute over the 2002–2003 IEP turned on whether [the student] was ready for full-time mainstream class. Now, as a nine-year old, [the student's]

19

readiness for mainstream education presents a different question calling for reassessment of his

educational development."); *Steven L.*, 89 F.3d at 467 ("[The student] has successfully

completed grade school and is on his way to high school. He will never again attend fifth grade.

The IEP modification at issue before the Level I and II hearing officers and in the district court

has been replaced by an IEP for [the student's] high school years."). In short, the exception to the

mootness doctrine does not save Plaintiff's case. This action must be dismissed as moot.

## II.      Merits of the Hearing Officer's Decision

Having determined that this action must be dismissed as moot, the Court need not

consider the parties' arguments regarding the merits of the Hearing Officer's decision. Indeed,

any such consideration arguably constitutes an advisory opinion, which courts generally should

avoid. Nonetheless, for the sake of completeness, the Court will proceed to discuss the merits of

Plaintiff's challenge to the administrative decision here.

"The standard for summary judgment in an IDEA case differs from that of typical

motions for summary judgment." *I.W.*, 2019 WL 479999, at *1 (citing *M.B. ex rel. Berns v.

Hamilton Se. Sch.*, 668 F.3d 851, 859 (7th Cir. 2011)). Under the IDEA, district courts reviewing

motions for summary judgment: "(1) receive the records of the administrative proceedings; (2)

hear additional evidence at the request of a party; and (3) basing its decision on a preponderance

of the evidence, grant such relief as the court determines is appropriate." *Z.J. v. Bd. of Educ. of

City of Chi., Dist. No. 299*, 344 F. Supp. 3d 988, 998 (N.D. Ill. 2018) (citing 20 U.S.C. §

1415(i)(2)(C)). District courts review *de novo* a hearing officer's determinations of law. *M.B.*,

668 F.3d at 860. However, a hearing officer's factual findings receive "due weight." *Id.* In other

words, a court provides "the usual deference that reviewing courts owe agencies when judicial

review is limited to the administrative record." *Id.* (citations omitted).

Where, as here, the Court "does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is strongly convinced that the order is erroneous." *Alex R.*, 375 F.3d at 612. "This level of review is akin to the standards of clear error or substantial evidence." *Id.* at 612. Additionally, "the party challenging the outcome of the administrative hearing bears the burden of persuasion in the district court." *Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 636 (7th Cir. 2010). Here, Plaintiff bears the burden of persuasion.

When deciding motions for summary judgment in IDEA cases, courts keep *Rowley*-deference in mind. In *Board of Education v. Rowley*, the Supreme Court explained that the IDEA's "provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." 458 U.S. 176, 206 (1982). "Because school authorities are better suited than are federal judges to determine educational policy, the district court is required, in its independent evaluation of the evidence, to give due deference to the results of the administrative proceedings." *Beth B. v. Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002).

Here, the parties ask the Court to determine whether the District denied or offered a FAPE to B.S. "Whether a school district has offered a [FAPE] to a disabled student is a mixed question of law and fact." *Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007). Under the IDEA, "a state that accepts federal funding to educate disabled children must provide such children with an education that is free, public, and appropriate." *M.B.*, 668 F.3d at 860 (citation omitted). "The school district, however, is not required to provide the best possible education." *Id.* (citation omitted). Rather, the IDEA only requires that a student's IEP "be

21

reasonably calculated to enable the child to receive an educational benefit." *Id.* (internal quotation marks omitted).

The IDEA imposes both a substantive obligation and a procedural obligation on a school district. *Hjortness*, 507 F.3d at 1064. That is, "[t]o comply with the requirements of the IDEA, a school district must follow the procedures set forth in the Act and develop an IEP through those procedures that is reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994). "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to open the door of public education to handicapped children, not to educate a handicapped child to her highest potential." *Id.* at 1166 (citations omitted).

### A. Evidentiary Rulings

As an initial matter, the parties raise evidentiary issues. Specifically, Plaintiff takes issue with the Hearing Officer's evidentiary rulings.

### 1. Application of the Rules of Evidence

Plaintiff claims that the Hearing Officer selectively ignored and applied the Illinois rules of evidence against Plaintiff throughout the due process hearing. (Am. Compl. ¶¶ 133–35.) As the record demonstrates, the Hearing Officer and Plaintiff's counsel exchanged multiple emails regarding the application of the rules of evidence in due process hearings. (PRDSMF ¶ 74.) In the email exchange, the Hearing Officer explained to Plaintiff's counsel that the standard Rules of Evidence do not strictly apply in due process hearings.

The Hearing Officer did not err in giving such an explanation to Plaintiff's counsel. "[ISBE] guidance explains that the 'federal or state rules of evidence do not apply to the IDEA

hearing process in Illinois.'" *I.W. ex rel. A.M.V. v. Lake Forest High Sch. Dist. No. 115*, No. 17 C 7426, 2019 WL 479999, at *10 (N.D. Ill. Feb. 7, 2019). Instead, hearing officers "may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs." *Id.* at *10 (quoting ISBE guidance). Indeed, "IDEA hearings are deliberately informal and intended to give [administrative law judges] the flexibility that they need to ensure that each side can fairly present its evidence." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005). To the extent Plaintiff objects to the Hearing Officer's evidentiary rulings, the Court reviews those rulings for clear error. As discussed below, the Hearing Officer's evidentiary rulings were not clearly erroneous.

### 2. Exclusion of the District's Lead Counsel as a Witness

Plaintiff also contends that the Hearing Officer erroneously denied Plaintiff's repeated demands to cross-examine Michelle Todd, the District's lead counsel and the person who signed the District's response to Plaintiff's due process complaint. According to Plaintiff, Todd was the only witness from the District who could competently testify about whether the District had adopted the June 2021 IEP and whether the District had complied with the IDEA. Thus, Plaintiff contends that because Todd was excluded as a witness, the District failed to proffer any witness with knowledge of these disputes.

This Court disagrees. The Hearing Officer did not err in denying Plaintiff's request to disqualify Todd as counsel for the District and to call Todd as a witness. Plaintiff is mistaken that the Hearing Officer denied her request "without explanation." In a written ruling emailed to the parties on November 4, 2023, the Hearing Officer explained the basis for his ruling, reasoning that granting Plaintiff's requests would "have the potential of introducing jeopardy for every special education due process attorney (district or parent) in Illinois of being stricken as the

chosen attorney for either side." (PRDSMF ¶ 73.) The Hearing Officer further reasoned that Plaintiff would have ample opportunity to adduce testimony from approximately 20 identified witnesses, many of whom had direct knowledge of or interaction with B.S., during the due process hearing. (*Id.*) Indeed, Plaintiff's response to Defendant's statement of facts admits that the Hearing Officer offered these reasons as the basis for his ruling. (*Id.*) At the actual hearing, which spanned five days, the Hearing Officer heard testimony from 16 fact witnesses, four of which were presented by Plaintiff, and reviewed hundreds of exhibits. (*Id.* ¶ 75.) Given the number of witnesses, many of whom had worked with B.S., Plaintiff had plentiful opportunity to question witnesses with knowledge of the disputes in this case. As such, the Hearing Officer's exclusion of Todd as an additional witness does not rise to the level of clear error.

### 3.     Consideration of the Parties' Evidence

Plaintiff further claims that the Hearing Officer only considered the District's evidence in reaching his decision. (Am. Compl. ¶¶ 136–41.) This is not so. Contrary to Plaintiff's allegations, the Hearing Officer repeatedly cited Plaintiff's exhibits and considered the testimony of Plaintiff's expert witness, a board-certified behavior analyst and school psychologist. (*See, e.g.*, Hearing Officer's Opinion at 5 n. 22, 8 n. 41, 8 n. 46, 9 n. 51, 11 n. 71, 16 n. 108, 17 n. 118, 24 n. 167, 24 n. 169; *see also id.* at 9 n. 58.) To the extent the Hearing Officer did not explicitly rely upon the testimony of Plaintiff's witnesses in his ruling, that remained within his discretion. The question of how much weight to give certain evidence is a question for the factfinder. "The fact that the [hearing officer] credited some witnesses over others and chose not to address every witness' testimony in [his] opinion is not a basis to overturn [his] decision." *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Michael R.*, No. 02 C 6098, 2005 WL 2008919, at *23 (N.D. Ill. Aug. 15, 2005); *see also Dale M. v. Bd. of Educ. of Bradley-Bourbonnais High*, 237 F.3d 813, 816

(7th Cir. 2001) (reviewing courts "must give considerable weight to any credibility determinations made by the first hearing officer"). In a detailed 27-page opinion, the Hearing Officer thoroughly addressed the relevant evidence and witness testimony. The Hearing Officer did not err in his consideration of the parties' submitted evidence.

### B.     May 2021 IEP and June 2021 IEP

Before turning to the primary disputes underlying this action, the Court first considers a preliminary dispute between the parties. Namely, the parties dispute whether the May 2021 IEP and the June 2021 IEP are separate IEPs or whether the latter amended the former. The primary differences between the May 2021 IEP and the June 2021 IEP were that the May 2021 IEP recommended placement in a blended early childhood classroom and did not include a one-to-one paraprofessional, while the June 2021 IEP recommended placement in a general education classroom for 81% of B.S.'s weekly school time with a one-to-one paraprofessional. Plaintiff maintains that the June 2021 IEP was separate from the May 2021 IEP, and that the District was required to adopt the June 2021 IEP. The District, however, maintains that the June 2021 IEP amended the May 2021 IEP, and that the District properly adopted the amended IEP.

Regardless of whether the June 2021 IEP represented a new IEP or amended the May 2021 IEP, the parties agree that the terms set at the June 2021 IEP meeting (as opposed to those set at the May 2021 IEP meeting) were the operative terms at the time B.S. enrolled in the District in 2023. Although the parties dispute whether the District adopted the June 2021 IEP, they do not dispute that the June 2021 IEP required one-to-one support for B.S. when he enrolled in the District.[5] The parties' dispute over the characterization of the IEPs is, nonetheless, relevant

---

[5] While maintaining that it adopted the terms of the June 2021 IEP, the District raises the alternative argument that it was not required to adopt the June 2021 IEP because B.S. did not transfer school districts in the same school year. Rather, B.S. was homeschooled for approximately 16 months before enrolling in the District. Because Plaintiff's claims rely on the provisions of the IDEA that concern intrastate transfers

insofar as Plaintiff argues that the Hearing Officer erroneously failed to consider the June 2021 IEP and only considered the May 2021 IEP at the due process hearing. Notably, the Hearing Officer's opinion only refers to an IEP that the Oswego District developed for B.S. in May 2021 and does not refer to an IEP created in June 2021. Nonetheless, this Court does not find the Hearing Officer's omission concerning. Rather, the Hearing Officer's reference to an IEP created in May 2021 and failure to mention an IEP created in June 2021 constitutes at most a minor oversight.

It is clear from the opinion that the Hearing Officer was aware of the June 2021 IEP's requirements and applied those requirements in reaching his decision. Indeed, the Hearing Officer's findings of fact state that, at the time of B.S.'s enrollment in the District in 2023, the operative IEP provided B.S. with a placement of 81% in the general education classroom with a one-to-one paraprofessional assigned to B.S. (Hearing Officer's Opinion at 5.) These are precisely the terms of the June 2021 IEP. Moreover, the Hearing Officer's subsequent findings of fact and conclusions of law demonstrate that the Hearing Officer considered whether the District had provided one-to-one support to B.S. under the terms of the operative IEP. (*Id.* at 6, 20.) Had

---

"within the same academic year," the District argues that Plaintiff's claims cannot survive. *See* 20 U.S.C. § 1414(d)(2)(c)(i). Based on a review of the record, it appears that the District failed to raise this argument at the due process hearing. Neither the Hearing Officer's opinion nor the District's response to Plaintiff's due process complaint contemplate the argument. As the District only raises this argument for the first time before this Court, the Court deems it waived. *See Richard Paul E. v. Plainfield Cmty. Consol. Sch. Dist. 202*, No. 07 C 6911, 2009 WL 995459, at *12 (N.D. Ill. Apr. 9, 2009) ("While [p]laintiffs make several arguments that [d]efendant failed the *Rowley* test [for IDEA compliance], the Court addresses only those arguments raised before the [hearing officer]; [p]laintiffs waived their remaining arguments, which they raised for the first time before this Court. This approach finds support in both common sense and requirements laid upon this Court by the standard of review: the court must give the [hearing officer's] findings of fact 'due weight,' a task made impossible where the [hearing officer] has made no factual findings." (citations omitted)); *see also J.D. v. Crown Point Sch. Corp.*, No. 2:10–CV–508–TLS, 2012 WL 639922, at *14 (N.D. Ind. Feb. 24, 2012) ("The Court agrees with the [d]efendant that by failing to raise it at the lower administrative levels the [p]laintiffs have waived argument as to the procedural failure to properly evaluate [the child] or identify [the child] as a student with [a specific learning disability].").

the Hearing Officer intended to refer only to the terms of the May 2021 IEP, which did not

provide for one-to-one support, such an analysis would have been unnecessary, indeed,

nonexistent. Because the record supports that his opinion was based on the operative June 2021

IEP, the Hearing Officer's minor omission did not render his opinion erroneous.

### C.       The District's Adoption of the June 2021 IEP

The Court now turns to the first of the primary merits disputes between the parties:

whether the District failed to adopt and implement the June 2021 IEP.[6] Pursuant to Illinois law,

when a student's new school district receives a copy of the student's IEP before or at the time of

enrollment, the district may adopt the IEP without an IEP meeting if the parents are satisfied

with the IEP and the new district determines that the current IEP is appropriate and can be

implemented as written. Ill. Admin. Code tit. 23, § 226.50(a)(1)(A). Here, Plaintiff provided the

District with a copy of the June 2021 IEP, Plaintiff expressed satisfaction with that IEP, and the

parties agreed that the District would adopt it. The question, then, is whether the District's

subsequent actions amounted to an adoption of the June 2021 IEP. At the center of this dispute is

whether the District provided B.S. with a one-to-one paraprofessional pursuant to the June 2021

IEP: Plaintiff maintains that the District failed to provide this service, while the District asserts

that it adequately fulfilled its obligation. This Court agrees with the Hearing Officer that the

District adopted the June 2021 IEP and finds that the District has met its substantive obligation

under the IDEA.

A student receives a FAPE when a school district provides the student with "an

educational program that is 'reasonably calculated to enable the child to receive educational

---

[6] For the purposes of the remaining discussion, the Court refers to the operative IEP at the time of B.S.'s
enrollment in the District in 2023 as the June 2021 IEP.

benefits." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 394 (2017). Provision of a one-to-one aide constitutes a "related service," that is, a "support service[] 'required to assist a child [with a disability] to benefit from' [special education]." *Id.* at 390 (quoting 20 U.S.C. § 1401(26)). "The IEP is the means by which special education and related services are tailored to the unique needs of a particular child." *Id.* at 391.

Here, the record reveals that the District's reliance on certified staff to provide one-to-one support to B.S. constituted adequate support for his unique educational needs. Although the two full-time paraprofessionals assigned to the BEST classroom were afraid to work with B.S. because of his highly dysregulated behavior, the BEST classroom teacher, who had developed a positive relationship with B.S., served as one-to-one certified staff support to B.S. during his time in the classroom. When the BEST classroom teacher was not working with B.S. as his one-to-one support, other members of the District's team, including the BEST program occupational therapist, social worker, and school psychologist, worked directly with B.S. to provide such support. B.S. also received one-to-one occupational therapy services from the BEST occupational therapist, who exceeded the required service minutes under the June 2021 IEP.

Plaintiff nonetheless maintains that the District did not provide a one-to-one aide to B.S. because of a hiring shortage. To the extent Plaintiff relies on the District's hiring shortage to argue that the District failed to fulfill its obligation, she mischaracterizes the record. Namely, Plaintiff observes that the District admitted at the March 9, 2023, IEP meeting that "a 1:1 would be appropriate for [B.S.] . . . however, the [IEP] team [was] worried about being able to find someone due to [a] hiring shortage." (DRPSMF ¶ 44.) But Plaintiff provides an incomplete picture of the District's representations. Notably, she leaves out that the District's IEP team was also "worried … [that] having a different sub[stitute] come in would not be beneficial for

[B.S.]." (Administrative Record Part 1 at 841, Dkt. No. 37; *see also* PRDSMF ¶ 32.) The hiring shortage required the use of substitute paraprofessionals in place of a full-time paraprofessional, and the District reasonably determined that the level of change and inconsistency from employing substitute paraprofessionals would be harmful to B.S. and exacerbate his dysregulation.

Although the District concedes that there was a hiring shortage, that shortage did not deter the District from providing one-to-one support to B.S. via the District's certified staff members. Those certified staff members provided one-to-one attention to B.S. while he was in the classroom. This Court agrees with the Hearing Officer that the District's provision of the certified staff serving as B.S.'s one-to-one aide constituted the necessary level of support "reasonably calculated to enable [B.S.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 580 U.S. at 403.

To the extent the District deviated from specific provisions of the June 2021 IEP, the Court finds that the District acted reasonably and its actions did not constitute a "material failure to implement [B.S's] IEP." *Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 31 (D.D.C. 2012). Indeed, as the Ninth Circuit has explained:

> The language [of the IDEA] counsels against making minor implementation failures actionable given that 'special education and related services' need only be provided 'in conformity with' the IEP. There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a [FAPE]."

*Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 821 (9th Cir. 2007) (quoting 20 U.S.C. § 1401(9)).

The June 2021 IEP required that B.S. receive 755 minutes of school time per week. Instead, the District started B.S. in the BEST program for one hour per day. That decision was

not made in a vacuum. Rather, the District recommended the schedule to support B.S.'s transition to the school setting and to enable him to become more acclimated after a lengthy period of homeschooling. Plaintiff herself agreed to this schedule and did not request any placement in the general education classroom. Insofar as the District did not completely provide the hours or types of academic instruction contemplated by the June 2021 IEP, it was a product of B.S.'s unique needs. Because B.S. demonstrated highly dysregulated behavior, he was unable to fully access academic instruction when he first enrolled in the District. As B.S. required frequent redirection, the BEST program focused on his functional behavior in the classroom, rather than academic demands. In short, the District's actions reflect its reasonable efforts to provide B.S. a FAPE and to accommodate his unique needs.

### D. B.S.'s Change in Placement to a TDS

Next, the Court considers whether B.S.'s change in placement to a TDS was illegal. The Court agrees with the Hearing Officer that the District's decision to place B.S. in a TDS was appropriate.

Plaintiff's main argument is that the District chose illegally to amend an obsolete IEP. Specifically, Plaintiff contends that the March 2023 IEP was an "amendment" to an "obsolete" IEP—namely, the May 2021 IEP—and because there was in fact no IEP to amend, the March 2023 IEP was illegal. Plaintiff's understanding of the matter is misguided. The District did not amend the May 2021 IEP. Rather, after adopting the June 2021 IEP, the District later adopted a *new* IEP at an IEP meeting on March 9, 2023. The Court defers to the Hearing Officer's findings of fact that the District's IEP team first developed all the required components of B.S.'s IEP at the March 9, 2023, IEP meeting and then, in concert with Plaintiff, recommended a placement to a TDS. (Hearing Officer's Opinion at 8–9.)

30

Furthermore, the record demonstrates that the District provided Plaintiff a meaningful opportunity to participate in the process of finding a suitable educational placement for B.S. Pursuant to the IDEA, "the state must provide the child with an 'educational placement' that complies with the IEP." *J.T. v. District of Columbia*, No. 20-7105, 2022 WL 126707, at *1 (D.C. Cir. Jan. 11, 2022) (citing 20 U.S.C. § 1412(a)(5) and 34 C.F.R. § 300.116(b)(2)). Although the IDEA does not define the term "educational placement," "it entitles parents to be 'members of any group that makes decisions on the educational placement.'" *J.T.*, 2022 WL 126707, at *1 (quoting 20 U.S.C. § 1414(e)). The IDEA "assures the parents an active and meaningful role in the development or modification of their child's IEP." *Hjortness*, 507 F.3d at 1064. Nonetheless, even where a child's placement is "contrary to the parents' wishes, it does not follow that the parents did not have an active and meaningful role in the modification of their [child's] IEP, as required by IDEA." *Id.* at 1065–66.

In this case, the District and Plaintiff repeatedly communicated about B.S.'s potential placement with a TDS and Plaintiff eventually agreed to such a placement, executed signed releases for the District to apply to TDSs for B.S., and visited multiple TDSs for B.S. "While a parent's failure to object to an IEP does not waive their right to challenge [it], [such failure] casts significant doubt on their contention that the IEP was legally inappropriate." *B.G. by J.A.G. v. City of Chi. Sch. Dist. 299*, 243 F. Supp. 3d 964, 978 (N.D. Ill. 2017). Given the numerous communications between the District and Plaintiff about B.S.'s placement in a TDS, and given Plaintiff's numerous representations of agreement, Plaintiff initially failed to object to such a placement. Her participation in the process was continuous and thus casts doubt on her present assertion that B.S.'s placement in a TDS was illegal. Any assertion that the District "duped" Plaintiff into agreeing to a TDS placement is similarly unfounded. (*See* Hearing Officer's

Opinion at 18.) Based on the record, this Court agrees with the Hearing Officer that the record shows Plaintiff's active role in the process and consent to a TDS placement for B.S.

Moreover, the District's attempts to secure a TDS placement for B.S. were appropriate, and any delay in securing a placement was due to Plaintiff's own refusal to commit to a TDS. Starting in March 2023 and through the fall semester, the District searched thoroughly for an appropriate TDS for B.S., reaching out to multiple ISBE-certified TDSs and sharing those potential options with Plaintiff. Although the District proposed placement at Guiding Light in May 2023, Plaintiff refused to accept the placement and declined enrollment, claiming that the population of students there was not suitable for B.S. "But so long as [a school district] provides a placement that 'meet[s] the standards of the State educational agency,' a school district need only provide education and related services . . . 'in conformity with' the IEP." *J.T.*, 2022 WL 126707, at *1. "[A] placement is not inappropriate simply because a school district fails to anticipate concerns on which the IEP is silent." *Id.* at *1. Insofar as Plaintiff was concerned about the population of students at a TDS, the March 2023 IEP was silent on that matter. *See id.* at *2 (finding that, among other reasons, a long commute to a school did not render an educational placement inappropriate where "the IEP specifically called for transportation services without flagging any distinctive concerns about the length of [the child's] commute"). The District appropriately found a TDS placement that would comply with the March 2023 IEP.

Relatedly, Plaintiff argues that the District has denied B.S. a FAPE since June 6, 2023, when he was last enrolled in school in the District. Again, the record reveals that Plaintiff's own actions accounted for B.S.'s extended absence from school. In addition to repeatedly refusing placement at Guiding Light, Plaintiff later declined to consider multiple TDSs throughout the summer and the fall, and she revoked her consent on all release forms to share B.S.'s records in

August 2023. Although the District maintained frequent communication with Plaintiff on its efforts to secure placement at twenty TDSs, at least, Plaintiff continued to block the District's efforts and declined the District's request to send referral packets to additional TDSs. While Plaintiff eventually expressed willingness to enroll B.S. in Connect Academy, the school terminated B.S.'s enrollment due to his highly dysregulated behavior.

Although parents are afforded a meaningful opportunity to participate, a parent's refusal to cooperate or meaningfully engage in communications with the school does not reflect poorly on the school or its compliance with the IDEA. *See Hjortness*, 507 F.3d at 1066 ("[T]he parents' intransigence to block an IEP that yields a result contrary to the one they seek does not amount to a violation of the procedural requirements of the IDEA. To find otherwise would allow parents to hold school districts hostage during the IEP meetings until the IEP yields the placement determination they desire."). "The Act welcomes parental input, but specifically charges the evaluation of the student and the framing of an adequate IEP to the school." *Z.B. v. District of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018). Ultimately, a school district complies with the IDEA where it selects an educational placement that can implement the student's IEP, regardless of whether the parent prefers another school. Here, the District actively worked to involve Plaintiff in the TDS selection, and despite the obstacles that Plaintiff presented, the District acted reasonably in its numerous efforts to secure a TDS placement for B.S. The Hearing Officer properly concluded that any delay in placement resulted from Plaintiff's conduct and that the District did not deny B.S. a FAPE. (*See* Hearing Officer's Opinion at 22–23.)

### E.    The District's Procedural Obligations

Even while finding that the District met its substantive obligations under the IDEA, the Court must consider the District's procedural obligations under the IDEA. That said, "procedural

33

defects do not necessarily indicate that a child has been denied a [FAPE]; only those defects that 'result in the loss of educational opportunity' deny a child a FAPE." *M.B.*, 668 F.3d at 860. Although the parties' arguments focus primarily on the District's substantive obligations under the IDEA, Plaintiff also argues that the District failed to timely conduct a reevaluation of B.S. in accordance with the IDEA's procedural requirements. The Hearing Officer addressed this procedural issue in his opinion, determining that the District failed to timely reevaluate B.S. but finding that this procedural violation did not amount to a denial of a FAPE. (*See* Hearing Officer's Opinion at 18–20.)

The IDEA requires that an initial evaluation to determine whether a child has a disability be completed within 60 days of receiving parental consent. 20 U.S.C. § 1414(c). Similarly, Illinois regulations provide that districts must determine whether an evaluation is warranted within 14 school days of a request and then complete that evaluation within 60 school days. Ill. Admin. Code tit. 23, § 226.110. Nonetheless, these timelines apply to *initial* evaluations, not reevaluations. As to reevaluations of a child with a disability, the IDEA provides that such a reevaluation may occur not more than once a year, unless the parent and public agency agree otherwise, and must occur at least once every three years, unless the parent and public agency agree that a reevaluation is unnecessary. *Id.* § 226.120; 34 C.F.R. § 300.303(b). A public agency must ensure that such a reevaluation is conducted if the child's parent or teacher requests a reevaluation. 34 C.F.R. § 300.303(a)(2).

Here, Plaintiff requested a reevaluation of B.S. in February 2023, and the District relied on Plaintiff's IEE in the spring of 2023. The following school year, in the fall of 2023, the District agreed to conduct another IEE at public expense. In December 2023, the District contracted with an independent evaluator to complete an evaluation. Based on these facts, the

Hearing Officer determined that the District failed to timely evaluate B.S. In doing so, the

Hearing Officer relied on the IDEA's prescribed 60-day timeline for initial evaluations. (Hearing

Officer's Opinion at 19.) It is not clear, however, that the Hearing Officer's reliance on this

timeline was correct because the 60-day timeline applies to initial evaluations, not reevaluations.

The parties, nonetheless, do not offer an alternative benchmark. In any case, the applicable

timeline is immaterial because the Court agrees with the Hearing Officer that any procedural

error on the District's part did not deprive B.S. of a FAPE. As the Hearing Officer similarly

observed, "[p]rocedural flaws do not automatically require a finding of a denial of a [FAPE]."

*Bd. of Educ. of Tp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007). Likewise,

where a procedural violation is alleged, a hearing officer may find that a child did not receive a

FAPE "only if the procedural inadequacies—(i) [i]mpeded the child's right to a FAPE;

(ii) [s]ignificantly impeded the parent's opportunity to participate in the decision-making process

regarding the provision of a FAPE to the parent's child; or (iii) [c]aused a deprivation of

educational benefit." 34 C.F.R. § 300.513.

Simply put, insofar as the District committed procedural error, the District's actions did

not result in a "loss of educational opportunity" to B.S. and thus did not amount to a denial of a

FAPE. *Ross*, 486 F.3d at 276. Significantly, the District and Plaintiff came to an agreement that

delaying B.S.'s evaluation was appropriate considering his extended period of homeschooling.

And the record further reveals that the District considered the FBA data in B.S.'s June 2021 IEP

from the Oswego District; relied on the Plaintiff-provided IEE in the spring of 2023; completed

new IEPs for B.S. in March, June, and September of 2023; actively included Plaintiff in the

decision-making process; and made multiple efforts to acquire an appropriate educational

placement for B.S. Together, these facts support a finding that the District did not impede B.S.'s

right to a FAPE. For the reasons stated, the District provided a FAPE to B.S. and sufficiently met its obligations under the IDEA.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No 48), as supplemented (Dkt. No. 71), is granted. This case is dismissed as moot. Accordingly, Plaintiff's motion for summary judgment (Dkt. No. 46) is denied. Given that the action is dismissed as moot, there is no adjudication on the merits. Nonetheless, in the interest of completeness, the Court observes that if there were still a live case or controversy with respect to the administrative decision regarding B.S.'s IEP, Plaintiff's challenge would fail on the merits. The Clerk shall enter a separate judgment. This case will be closed.

ENTERED:

Dated: May 28, 2025

Andrea R. Wood
United States District Judge